Howei, J.,
delivered the opinion of the court:
*300 This action is instituted under the general jurisdiction of the court by a boatswain in the Navy to recover the difference between the shore pay of his grade and the sea pay which he claims he is entitled to have by reason of his service as a boatswain on board the Santee, a vessel owned by the United States and stationed in the harbor at the United States Naval Academy.
The petition alleges, and the findings show, service of plaintiff' under orders in the capacity of boa.tswain on board the vessel named at the Naval Academy, ownership of the vessel by the United States, and that the duties performed by plaintiff on board the ship are practically the same as those required by boatswains on receiving ships of the Navy; and that her complement of officers and crew and the discipline maintained on board are practically the same as on receiving-ships. The contention of the claimant is that the facts bring .the case within the rule declared in Symonds v. The United States (21 C. Cls. R., 148; 120 U. S. R., 46) and Strong v. The United States (23 C. Cls. R., 10; 125 U. S. R., 656).
The Government rests its defense upon the reasons set forth in a letter of the Secretary of the Navy to the Comptroller of the Treasury, and the decision of the Comptroller in a case arising upon the claim of a mate for commutation of rations while serving on board the same vessel as claimant, and it is urged that this claim is not within the adjudicated cases first above set forth.
These reasons are: That the Santee is not in commission for any service; that her name has been stricken from the Naval Register; that she is “practically” no longer a part of the naval establishment in such a sense as to be a vessel of the United States Navy; that not being fit for sea service, and not being regarded as a vessel of the Navy, and not being at sea, the language of section 1571 does not apply to service rendered upon said vessel; and that the officers and men employed upon her are not there by any direct authority of the Department, but are serving upon the vessel as an adjunct of the Naval Academy under the orders of the Superintendent. And, further, that there being no regulation “expressly and in terms delegating to the Superintendent of the Academy the authority of the Secretary to attach officers to and detach them from the Santee and other vessels,” the implication arises that the service performed under the orders of the Superin *301 tendent is not service performed at sea under tbe orders of the Department. (In re Charles J. Murphy, Navy Department letter April 14, 1897, 3 Comp. Dec., 545.)
The statute provides: “No service shall be regarded as sea service except such as shall be performed at sea, under the orders of a department and in vessels employed by authority of law.” (Sec. 1571, Eev. Stat.)
“ Sea service” and duty “performed at sea” are terms which have been the subject of executive and judicial construction as terms not meaning the waters of the sea beyond the 3-mile limit, but applicable to the waters of the sea generally, subject to such restrictions, regulations, and requirements as are incident and peculiar to service on the high seas. The sea pay given to officers of the Navy by the Eevised Statutes (sec. 1556) may be earned where the services performed are under orders of the Navy Department in a vessel employed, by authority of law, in active service in bays, inlets, roadsteads, or other arms of the sea. And a vessel is at sea within the meaning of the statute although she is used as a training ship, anchored in a bay, and not in a condition to be taken out to sea beyond the mainland, or is used as a receiving ship at anchor in port at a navy-yard, communicating with the shore by a rope, and having a roof built over her deck, and not technically in commission for sea service. (United States v. Barnette, 30 C. Cls. E., 197; 165 U. S. R., 174.)
The act of August 5,1882 (22 Stat. L., 296, sec. 2), made it the duty of the Secretary of the Navy to cause to be examined by competent boards of officers of the Navy all vessels belonging to the Navy; and it provided that “ said boards shall ascertain and report to the Secretary of the Navy, in writing, which of said vessels are unfit for further service,” and that “it shall be the duty of the Secretary of the Navy, if he shall concur in opinion with said report, to strike the name of such vessel or vessels from the Navy Eegister and report the same to Congress.”
The third section of this act provided that “no officer of the Navy whose pay is provided for in this bill shall be employed on any shore duty after October 1,1882, unless the Secretary of the Navy shall determine that the employment of an officer on such duty is required by the public interests, and. shall so state in the order of employment, and also the duration of such service, beyond which time it shall not continue.”
*302 The act of March 3, 1883 (ib., p. 599, sec. 5), made it “ the duty of the Secretary of the Navy to cause to be appraised, in such manner as may seem best, all vessels of the Navy which have been stricken from the Navy Begister under the provisions of the act” above cited; and, if he “shall deem it ■ for the best interest of the United States, to sell any such vessel or vessels.” * * *
Under the authority of the act of 1882 a board was appointed to examine vessels, and the Santee was found to be “unfit for further service as a cruiser.” Her name was stricken from the “list of ships of the United States Navy” as the same is published in the Official Navy Begister, but that did not necessarily muster her out of the service. Since 1883 she has been borne upon the Begister under another and appropriate head. The power to sell the vessel under the act of 1883, supra, was never exercised, presumably because tlie vessel was found to be fit for further service in the same capacity and for the same purposes she had been for several years before that time. As a matter of fact, she continued to be substantially a receiving ship. She is, with other vessels, retained for useful purposes at the yards and stations, although stricken from the Official Navy Begister. (Ex. Doc., first session Forty-eighth Congress, vol. 8,162.)
Being subject to the usual military routine incident to vessels of the Navy when in active service in bays, inlets, road-steads, and other arms of the sea, put to kindred uses since she was reported unfit for further service as a cruiser, and her officers subject to the same regulations and discipline which prevailed before the Santee was condemned, she is to all intents and purposes to those serving upon her as officers as much a vessel in the Navy as she has been. The necessary sequence of emoluments for officers performing duty as at sea followed the responsibilities and duties of those officers who, like the claimant, are charged with these responsibilities and perforin these duties. The vessel is like a training ship at anchor in the bay, subject to such regulations as would have been enforced had she been put in order and used for cruising purposes.
It is the practice and custom to enlist crews for the summer cruise of tlie cadets on the Santee; at other times, when the exigencies of the service require, men are enlisted, transferred, and discharged from said vessel in the same manner and under *303 tbe same regulations which govern enlistments, transfers, and discharges on other receiving ships. Commissioned, warrant, and petty officers serving on board the vessel perform in all material respects the same duties and are subject to the same regulations, routine, .and discipline which prevailed prior to. January 1,1883. The vessel is furnished, upon proper requisition approved by the Navy Department, with all articles necessary for keeping it in order and repair,- a rough and smooth log is kept; proper flags are regularly hoisted; officers and seamen are required to obtain leave of absence from the officer in command before leaving the vessel and to report at the expiration of such leave; general muster of the officers and men is regularly held, and all signals are made from the vessel; the usual daily inspections and- customary drills and exercises are provided for, and the regular navy ration is issued to all petty officers and enlisted men aboard except when commuted as provided by law.
The claimant’s quarters are on the Santee as a vessel; he messes on board; he is required, when on duty, to wear the uniform of his grade, and is not permitted, when on duty, to live on shore with his family, and the reasons for allowing sea pay obtain as much as if the vessel is far from shore.
The order directing the claimant to proceed to the Naval Academy directed him to report to the Superintendent ‘‘ for duty on board the Santee and such other duty as he may assign you'.” (Finding n.) The Superintendent may have had the right to assign the claimant to shore duty, but did not do so. When the claimant proceeded there, he was directed to proceed to the officer in charge of the ships. The claimant is on duty on the vessel, therefore, “ under the orders of a department.” The Superintendent has charge of the grounds, buildings, and vessels in use at or belonging to the Academy. All officers there are under his command. (Regulations, United States Naval Academy, par. 3.) It is not unlike the case of a ship lying in a harbor at the service of a State for the purpose of nautical instructions, acting under the orders of a department, as in Barnette’s Case {supra).
Assignment to duty on a vessel used substantially as the Santee is, for purposes of a receiving ship, either by the Department or the Sup’erintendent, entitles the officer to pay, according to-his grade, as if he were performing duty at sea. It would not be fair to differentiate such a case from those *304 named above. The principles governing here can not be discriminated from the adjudicated cases.
The opinion of the court is that claimant is entitled to recover of and from the defendants the difference between the sea pay and shore pay of his grade the sum of 1176.98, for which judgment will be entered.